**CASCADIA LUMBER COMPANY, Inc., a corporation, Libelant,**

v.

**DOUBLE T INDUSTRIAL, INC., Respondent.**

Civ. No. 9058.

United States District Court
D. Oregon.
June 9, 1958.

Arno H. Denecke, Mautz, Souther, Spaulding, Denecke & Kinsey, Carl Robert Wells, McCormick & Wells, Portland, Or., for libelant.

Wendell Gray, Gray & Lister, Portland, Or., for respondent.

EAST, District Judge.

It appears from the statement of facts in the pretrial order entered herein that:

Libelant, Cascadia Lumber Company, Inc., is a corporation organized and existing under the laws of the State of Oregon, and has its principal place of business in Toledo, Oregon; that

Respondent, Double T Industrial, Inc., is a corporation organized and existing under the laws of the State of Oregon, and has its principal place of business in Sweet Home, Oregon; that

At all material times herein mentioned, libelant was the owner of a barge known as the Thompson No. 2, which had been used and was to be used in the future as a lumber-carrying barge in the Yaquina Bay and Yaquina River in smooth, navigable waters; that

On or about November 15, 1956, the parties hereto entered into an agreement whereby the respondent agreed to make certain repairs to the Thompson No. 2; that

On or about January 11, 1957, said barge, the Thompson No. 2, sunk while in the Yaquina River, a navigable water in the vicinity of Toledo, Oregon; and that

On or about January 22, 1957, libelant notified respondent by letter that libelant intended to abandon the Thompson No. 2 to the United States unless respondent desired to take over the barge. Libelant received no answer from the respondent to the said letter of January 22, 1957, and on or about January 28, 1957, libelant abandoned the Thompson No. 2 to the United States, acting through the Corps of Engineers.

The Court finds that its jurisdiction is stable under Sec. 1333, Title 28 U.S.C.A. It is fair to say from these statements and the evidence produced by the parties that three primary questions are presented to the Court:

(1) It appears conclusively from the evidence that on or about January 11, 1957, the barge was being repaired and that during the course of repairs it was the understanding of the parties that the Thompson No. 2 be placed in drydock so that certain bottom repairs could be made.

(2) It developed that there was no drydock available at this stage of repairs, whereupon the course of conduct was adopted whereby the vessel was to be turned over, or bottomed-up so that the bottom repairs could be made. Further, that during the course of this maneuver, by either premature flooding of one of the hulls by reason of openings cut in the hull, or by a parting of lines attached to caterpillar tractors on shore, Thompson No. 2 then, in an attempt to right herself, completely flooded and sank. Raising efforts failed, and on or about January 28, 1957, libelant abandoned Thompson No. 2 to the United States.

(3) The libelant claims that the respondent was in charge of these turning operations and was in sole custody of Thompson No. 2 and that the sinking was proximately caused by the negligence and incompetence of the respondent. Respondent denies this contention and claims he was merely acting as an agent, pursuant to the directions of libelant, throughout these turning operations. From these contentions and the evidence, the Court faces the problem in three aspects:

(1) Who, whether the libelant or the respondent, was in charge of and had direction of the turning operations?

(2) If the respondent had charge, control and direction of the turning operations, was the sinking due to respondent's negligence? If so, was such negligence the proximate cause of the sinking?

(3) If there was such negligence, what are libelant's damages?

■ As to query (1), I am satisfied from a preponderance of all of the evidence in the case that the respondent, through its servants and agents operating under the immediate supervision and direction of one Gordon, an officer of respondent, was the motivating force in the determination of the practicability of the turning operation to effect the bottom repairs and that throughout the entire operation of turning and the sinking of the vessel, the vessel was in the custody of the respondent and that the sinking and loss of Thompson No. 2 was proximately caused by the negligence and the unworkmanlike work of the ship's repairmen and that, therefore, respondent is liable to libelant for the loss of Thompson No. 2.

Query (2) has been determined by the foregoing.

As to query (3), there is competent, reliable testimony in the case that Thompson No. 2 was "a hybrid or an unorthodox vessel" consisting of two surplus or stripped Navy hulls bound and made fast together with a floor, suitable for the barging of lumber products, placed over the combined hulls, and so I find.

■ "Restitution in integrum" is the leading maxim applied by the admiralty courts to ascertain damages resulting from a collision, and on the same principle, value is the measure of compensation in case of total loss. There is no evidence in the case that there was a reasonable, ready cash market value upon which Thompson No. 2 could be placed for sale, nor that there was any reasonable cash market value for the vessel at the time of her complete loss on January 28, 1957 (the date upon which libelant abandoned the submerged vessel). To the contrary, the effect of the testimony of all of the witnesses on the subject was that this vessel had no cash market value because of its unique and unorthodox construction for a barge, and that none of the witnesses knew of any contemporary sales of like property in the vicinity of her use by libelant or on any similar navigable waters. This, then, is a case where the libelant's damages for the loss of its vessel are to be determined by some other measure. The President Madison, 9 Cir., 1937, 91 F.2d 835, at pages 844–845. This Court feels that any measure of damage based upon a reproduction or replacement cost of this hybrid vessel would be a ridiculous measure by reason of the testimony to the effect that to replace hulls of this nature, the cost would be in the sum of $200,000. Similarly, this Court feels that any measure of damages based upon the so-called original cost value of the hulls (war surplus purchase, $9,000), plus the cost of refitting and towage (approximately $19,000), plus the cost of reasonably necessary repair and maintenance, but less a reasonable depreciation factor over the years of service, would likewise be a ridiculous measure of damage.

This Court believes that the measure of damage in a case of this nature is best if it is based upon a logical formula which takes into consideration the fair reasonable cost of an orthodox smooth water (Yaquina River and Bay or similar navigable waters) lumber barge of reasonable comparable carrying capacity and navigability as to Thompson No. 2, plus cost of reasonably necessary repairs and maintenance over the period of service, but less a reasonable depreciation based upon the maritime depreciation factor for "6–7 years," by subtracting each year a percentage of the residual value of the object carried over from the last year. Ozanic v. U. S., 2 Cir., 1948, 165 F.2d 738. The President Madison, supra.

There is testimony before this Court by a disinterested, competent marine engineer of his opinion of the reasonable

cash market value of Thompson No. 2 at the time of her abandonment, using the above mentioned formula. Therefore, by a consideration of all of the evidence with the aid of this expert advice, this Court finds that the fair reasonable cash market value of the barge Thompson No. 2 at the time of her abandonment was in the amount of $47,667. Therefore, this Court concludes that the libelant is entitled to have judgment against the respondent for said sum of $47,667, together with interest thereon at the rate of 6% per annum from January 28, 1957, until paid, together with costs of proceedings.

In answer to libelant's claim for salvage service, this Court finds that from the time immediately prior to the sinking of the vessel until the time of the actual abandonment on January 28, 1957, the respondent was still in charge of the vessel as the ship's repairman.

Proctors for libelant are requested to submit proposed findings of fact, conclusions of law and decree.